J-A21016-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| ROBERT ROY QUINN, | |
| Appellant | No. 2 WDA 2017 |

Appeal from the Judgment of Sentence August 3, 2016
In the Court of Common Pleas of Cambria County
Criminal Division at No(s): CP-11-CR-0000147-2016

BEFORE:  BENDER, P.J.E., OLSON, J., and STABILE, J.

JUDGMENT ORDER PER CURIAM :                **FILED SEPTEMBER 18, 2017**

Appellant, Robert Roy Quinn, appeals *pro se* from the judgment of sentence entered on August 3, 2016 in the Criminal Division of the Court of Common Pleas of Cambria County, as made final by the denial of post-sentence motions on October 4, 2016.  We affirm.

At the conclusion of trial on June 10, 2016, a jury found Appellant guilty of stalking, 18 Pa.C.S.A. § 2709.1(a)(2).  Thereafter, the trial court sentenced Appellant to incarceration in county prison for a period of 12 months less one day to 24 months less one day.

Appellant filed timely *pro se* post-sentence motions on August 12, 2016, which the trial court denied on October 4, 2016.  Because the October 4 order was not forwarded to Appellant, the court, on November 22, 2016, reinstated Appellant's direct appeal rights and allowed him to file an appeal

within 30 days. Appellant filed a timely notice of appeal on December 20, 2016 together with a concise statement pursuant to Pa.R.A.P. 1925(b). Appellant's concise statement raised seven claims, which the trial court addressed in an opinion issued on March 24, 2017.

We have carefully reviewed the submissions of the parties, the opinion of the learned trial court, and the certified record prepared in this case. In its opinion, the trial court determined that Appellant was not entitled to relief because he failed to preserve his claims for appellate review or, alternatively, his claims lacked merit. **See generally** Trial Court Opinion, 3/24/17, at 1-36. We wholly concur in the trial court's assessments and conclude that the court thoroughly, adequately, and accurately addressed each of the issues Appellant raises on appeal.[1] Accordingly, we shall affirm for the reasons expressed by the trial court and adopt its opinion as our

_____

[1] We note that Appellant's brief does not comply with the Pennsylvania Rules of Appellate Procedure in many ways which, as the Commonwealth points out, makes it difficult to identify the various issues and arguments raised on appeal. These defects alone support dismissal. **See** Pa.R.A.P. 2101 (appeal may be dismissed where defects in appellant's brief are substantial); **Kern v. Kern**, 892 A.2d 1, 5-6 (Pa. Super. 2005) (dismissal appropriate where failure to conform to appellate rules hampers this Court's ability to discern contested issues), *appeal denied*, 903 A.2d 1234 (Pa. 2006). Here, however, the trial court's opinion addresses all of the claims raised in Appellant's concise statement and, as such, discusses all of the issues Appellant appears to raise in his brief. For this reason, we have elected to forgo dismissal and, instead, deny relief on the merits for the sound reasons set forth by the trial court.

own. The parties are hereby instructed to include a copy of the trial court's opinion in all future filings relating to our disposition of this appeal.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/18/2017

IN THE COURT OF COMMON PLEAS OF CAMBRIA COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA,

vs.

ROBERT ROY QUINN,

Defendant.

No. 0147-2016

Opinion Pursuant to Rule of Appellate
Procedure 1925(a)(1)

# Opinion Pursuant to Rule of Appellate Procedure 1925(a)(1)

Bernstein, J: Robert Quinn (Quinn) appeals from a guilty verdict rendered following jury trial on June 8-10, 2016. Quinn was found guilty of Count 1, Stalking at 18 Pa.C.S.A. §2709.1(a)(2), and Not Guilty of Count 2, Terroristic Threats at 18 Pa.C.S.A. § 2706(a)(1).

On January 1, 2016 Quinn was arrested and charged with one count of Stalking and one count of Terroristic threats. The Affidavit of Probable Cause, filed by Police Officer Charles Cypher (Cypher), alleged that Barbara Labarko (Labarko) told police that she and Quinn had formerly been engaged and that Quinn had not been taking the break up well. DOCKET NO. 147-2016, POLICE CRIMINAL COMPLAINT AFFIDAVIT OF PROBABLE CAUSE ["AFFIDAVIT"]. Labarko told police that Quinn had been harassing and threatening her, driving by her residence, and left more than 100 voicemails and text messages on Labarko's phone in two days. *Id.* Labarko further stated that Quinn had been following her around Planet

Fitness and her place of employment, Applebees. *Id*. Labarko ultimately told the police that, as a result of these actions, she was in fear for her life. *Id*.

As a result, charges were filed and Quinn's preliminary hearing was set for January 26, 2016. There is no indication that Quinn was represented by counsel at the time of his Preliminary Hearing. Quinn executed and signed portions of the "Notice of Arraignment, Preliminary Conference, and Trial Form," and no attorney entered an appearance on this Notice. NOTICE OF ARRAIGNMENT, PRELIMINARY CONFERENCE, AND TRIAL FILED FOR RECORD ON JANUARY 29, 2016. Thus, Quinn proceeded *pro se* at his Preliminary Hearing and all charges were waived, holding them for court. Quinn also signed Section 5 of the Notice, entitled, "Notice of District Attorney's Preliminary Conference and Trial Date." *Id*. However, the spaces where the date for such conference is usually placed was empty. *Id*. Nonetheless, Quinn still signed the section that indicated he received notice of his Preliminary Conference.

The Record also contains a form entitled, "District Attorney's Preliminary Conference Form." DISTRICT ATTORNEY'S PRELIMINARY CONFERENCE FORM FILED FOR RECORD ON MAY 19, 2016 ["Conference Form"]. This Conference Form was signed by Assistant District Attorney Wayne Langerhole (Langerhole) and dated May 17, 2017. The Conference Form indicates that the case was set for a jury trial and jury selection was to be held on June 2, 2016. *Id*. However, neither Quinn nor an attorney acting on his behalf signed the Conference Form. *Id*.

Jury selection was held on June 2, 2016 at which time Quinn continued to proceed *pro se*. N.T. JURY SELECTION, 6/2/2016, pgs. 4-6. At the outset, and without the jury pool present, the trial court indicated to Quinn that this jurist, in her previous capacity as an Assistant District Attorney, had been involved with an indirect criminal contempt regarding a Protection

From Abuse ["PFA"] order against Quinn. The Court determined that this jurist should not be disqualified from this matter and did not recuse. The trial court stated,

> I want to begin, Mr. Quinn, I didn't remember the case, but it was brought to my attention apparently in 2013 or 2014 when I was an assistant district attorney there was a PFA indirect criminal contempt, and I was the assistant DA on that case. I believe that the case was dismissed.
>
> I don't have any independent recollection of the case and, because this is a jury trial, and in reviewing the rules, I have no opinion. I have no recollection of it, and I determined, since this is a jury trial, the fact finders are the jurors and not the court, and that I do not believe there is any conflict. I did want to disclose that to you, however, just for complete transparency.

*Id.* at 3.

Next, the trial court questioned Quinn as to whether he wanted counsel appointed or wished to continue *pro se*. *Id.* at 4. Quinn indicated that he would proceed *pro se* and so the trial court had Quinn execute a WAIVER OF COUNSEL, DATED JUNE 2, 2016, and conducted an oral colloquy of Quinn regarding his decision to waive his right to counsel. N.T. JURY SELECTION, 6/2/2016, pgs. 5-8. After conducting the colloquy and finding that Quinn knowingly and voluntarily waived his right to counsel, the trial court appointed standby counsel, Attorney John Lovette, III. *Id.* at 9-10.

When the jury pool was brought into the courtroom, the trial court proceeded to instruct the pool on what would happen during the jury selection process. The victim, Barbara Labarko (Labarko), was also present in the courtroom and sat behind ADA Langerhole. During the trial court's instructions, the Court asked Langerhole to, "give a very brief summary of the alleged facts of the case," and further reiterated that, "again, these are just allegations." *Id.* at 46. Langerhole then gave the jury pool the summary of the alleged facts as requested by the trial court:

The defendant and victim were involved in a relationship. She ended the relationship. And on or about December 2015 to January 14, 2016, the defendant stalked the victim, sent thousands of text messages when the victim did not want them and sent over 200 voicemails threatening, demeaning, placing her in fear, then followed her to Planet Fitness, approached her, kissed her on the cheek, was taken into custody shortly thereafter. Charges were filed as a result.

*Id.* at 46-47.

Jury selection continued and the Court asked the jury panel, "Have you, any member of your family or any close friends been a victim of a crime, or have you been present when any crime was committed?" *Id.* at 47. In response to the Court's question, Panelist #19 approached at sidebar:

Panelist #19: Hi. My youngest daughter was molested by an older person.

The Court: Okay. I am sorry to hear that. Where was that, what county?

Panelist #19: Cambria.

The Court: And what year?

Panelist #19: Honestly, I --.

The Court: Ish?

Panelist #19: Late '90s, early 2000s. I don't remember.

The Court: That helps. Now, obviously that's a very different thing from what we are dealing with today. Is there anything about that experience which would not allow you to sit and be fair and impartial in this case?

Panelist #19: The fear in that girl's eyes over there.

The Court: Pardon me?

Panelist #19: I seen the fear in that little girl's eyes sitting over there.

The Court: And what are you telling me then? Do you think you can be fair and impartial in this case?

Panelist #19: I don't know honestly.

The Court: I'm going to go a little further, which is okay. I asked several others the same question. What I'm asking you is - - Mr. Quinn is the one facing charges. They are allegations at this point. So I'm asking, would you be able to sit, listen to the witness on the stand and gain the facts from the witnesses, and then I will give you the law that you are to apply, and you and your fellow jurors would go back to deliberate. Are you able to do that fairly and impartially?

Panelist #19: Yes.

The Court: Okay. Any follow up questions based upon that?

Attorney Langerhole: No. Thank you, sir.

The Defendant: What number was that?

Attorney Langerhole: Nineteen.

*Id.* at 57-59. At the close of the trial court's questions for jurors, Quinn and Langerhole were given the chance to move to strike any panelist for cause. Quinn moved to strike Panelist #19, "who indicated that he saw fear in the girl's eyes." *Id.* at 80. Langerhole argued that he believed Panelist #19 ultimately stated that he could be fair and impartial. The trial court ruled,

> I am going to deny it based upon the fact that the court's notes also indicate that, although he made that statement early, as the court questioned him about the facts of the case, the fact that you were a separate issue than his daughter who was molested, that was the original discussion, he indicated after the discussion about his role as a juror that he believed he can be fair and impartial.

> So your strike for cause is denied. And just - - Mr. Quinn, obviously you will have five challenges, so you'll have that.

*Id.*

As the selection process continued, and while Quinn and Langerhole exercised their challenges by passing a binder back-and-forth, Panelist #39 got up from his seat and walked toward the victim, Labarko, who was seated behind Langerhole:

The Court: I'm sorry. Excuse me. Jurors, jurors, stop. Excuse me, sir. No one can leave their seat area please so - - .

Attorney Langerhole: That juror came up - -.

The Court: I understand. That's okay, sir. Everybody has to stay in their general seat area. All right. You can go ahead. We're good. Attorney Langerhole and Mr. Quinn, if you could come forward, please. Everyone's okay. We're good. If you have any other questions for the court, raise your hand and I can have one of my staff members bring you down to me.

SIDE BAR DISCUSSION:

Attorney Langerhole: Just for the record, that juror was asking [Labarko] a question which she didn't respond to.

The Court: Who?

Attorney Langerhole: My victim.

The Court: What number is he?

Attorney Langerhole: He's in the back, 29 I think – 39.

The Court: Thank you.

Attorney Langerhole: I don't know what he said.

The Court: Mr. Quinn, I'm going to strike that individual for cause.

The Defendant: I was going to strike him, yeah.

The Court: He keeps moving and nobody responds. I want to clarify, juror number 39, while I gave the opportunity for the jurors to stretch, came down on his own accord and started trying to speak to the victim. The court asked him to step away. He had not interacted with anybody, nor has he since that time, and the court will strike that individual for cause.

*Id.* at 84-85.

Attorney Lovette (Lovette) was appointed by the Court as standby counsel prior to jury selection and continued to act as such through trial. Quinn proceeded *pro se* throughout the trial with Lovette seated behind him. Lovette did not participate in the trial and it is

unclear from the record whether Quinn consulted Lovette outside the trial. However, after the jury rendered its verdict of not guilty as to Terroristic Threats and guilty as to Stalking, Lovette began to act as Quinn's counsel by speaking to the Court on Quinn's behalf. N.T. JURY TRIAL, 6/10/2016, pg. 87.

Immediately following the verdict, this Court considered the arguments of counsel regarding bond pending sentencing. The trial court held that Quinn could be released if he was placed on a home monitor in his apartment at 803 Edwards Hills. *Id.* at 97-98. Quinn indicated that he would be able to stay at this apartment and the trial court allowed such release as, among other facts, the apartment was not located near the residence of the victim.

However, at a later hearing, probation officer Richard Rok [Rok] testified that Rok had contacted Quinn's landlord who indicated that Quinn had not paid rent on the apartment for over a year and owed $4,092 in back-rent. N.T. BOND REVOCATION HEARING, 6/16/2016, pg. 4. Rok stated that the landlord had not yet evicted Quinn because the landlord had never been able to serve Quinn. *Id.* Rok further stated that he had looked into setting up an in-home monitor at Quinn's mother home, but she did not have a landline, thus making it impossible to set up monitoring at that residence.

The trial court reviewed the statutory factors required when considering bail and found that Quinn had been deceptive and attempted to mislead the Court by stating that he was able to reside at the 803 Edwards Hill apartment when he had not paid rent in over a year and would have been evicted if the landlord had been able to locate Quinn to serve him with notice of eviction. *Id.* at 24-25. As such, the Court revoked Quinn's bail and remanded him to the Cambria County Prison pending his sentencing.

At sentencing, held on August 3, 2016, Quinn continued to be represented by Attorney John Lovette. Attorney Lovette correctly stated that Quinn's standard guidelines for sentencing were three to fourteen months. N.T. SENTENCING HEARING, 2/28/2017, pg. 6. The trial court then considered testimony presented and evidence of record and sentenced Quinn to undergo imprisonment for not less than "one year less a day, nor more than two years less a day" in the Cambria County Prison. SENTENCING ORDER DATED AUGUST 3, 2016. Quinn was further sentenced to undergo a period of probation for three years under the supervision of the Cambria County Probation Bureau, consecutive to the term of incarceration. *Id.* The trial court further ordered that, as conditions of Quinn's sentence, he undergo a psychological evaluation with Dr. Scotilla, follow any recommended treatment, and have no contact with the victim, Labarko, for the period of his sentence. *Id.*

On August 16, 2016 Quinn filed Post-sentence Motions. POST-SENTENCE MOTIONS FILED FOR RECORD ON AUGUST 16, 2016 ["POST-SENTENCE MOTIONS"]. A hearing was held on the Post-trial Motions on September 27, 2016 where Quinn again elected to proceed *pro se.* N.T. POST-SENTENCE MOTIONS HEARING, 9/27/2016, pg. 11. At the outset of the hearing, Attorney Lovette gave a brief summary of the events that had taken place between the sentencing hearing on August 3, 2016 and the Post-sentence Motions hearing on September 27, 2016:

> Attorney Lovette: Your Honor, before we proceed, I wanted to put a couple things on the record. As the Court is aware, Mr. Quinn decided to represent himself all the way through trial until the verdict was rendered. At that time he asked the Court to provide standby counsel for him, which I - - well, I was appointed standby counsel and I did sit through the trial, but at the time that the jury verdict came in he asked that I step in and go ahead and represent him.
>
> I did represent him during a motion for bond pending sentencing. I did represent him for a motion to revoke his bond that was filed by the Commonwealth, and I did

represent him at his sentencing. Thereafter he was sentenced to a term of incarceration. He told me in court that day via letter that he wished to file an appeal, so on August 12th I did visit him at the prison to meet with him about the appeal that I was going to be filing for him, specifically post-sentence motions.

At that time Mr. Quinn advised me and did show me a copy of post-sentence motions that he wished to file on his own. We had a lengthy conversation, and at that time he stated that he again wanted to represent himself and he felt that his post-sentence motions were the ones that were appropriate and that he wanted to file. At that time I took a copy of his post-sentence motion to the Clerk of Courts to file those for him in a timely manner to preserve his appeal rights. As the Court is aware, there is a law and a rule in place that you are not entitled to dual representation. You can't represent yourself and have an attorney represent you at the same time.

. . .

So in order to file his motion that he wanted filed at the Clerk of Courts, the Clerk of Courts informed me that I would have to withdraw as counsel, which I did do on that day, August 12th. And then I filed his post-sentence motion that he instructed me to do. And we are here today for the hearing where Mr. Quinn is again, at least at this time, representing himself. And that's all I wanted to do, Your Honor, is just build the record and let the Court know what transpired after his sentencing.

*Id.* at 2-3. After Attorney Lovette's summary, Quinn indicated to the trial court that he wished to proceed *pro se* and the trial court subsequently conducted a colloquy of Quinn to be sure that Quinn understood his right to representation before he proceeded. *Id.* at 5-11. After completing such, the trial court heard argument from Quinn and the Commonwealth regarding Quinn's Post-sentence motions.

Quinn raised five substantive issues in his Post-trial motions. First, Quinn argued that he should have been placed in the diversionary program of Mental Health Court since he has a history of mental illness. *Id.* Second, Quinn asserted that this jurist should have recused herself based on her involvement with a Protection From Abuse indirect criminal contempt filed against Quinn in this jurist's past capacity as an Assistant District Attorney. Third, Quinn requested a new trial as the jury panel was poisoned by Langerhole's summary of the alleged

crimes committed. *Id.* Fourth, Quinn requested a modification of sentence so that he could serve his sentence on house arrest or by reporting to Cambria County's Day Reporting Center. Fifth, Quinn asserted that the costs and fines assessed to him as a result of his trial were too high as he had been found indigent by Judge Linda Rovder Flemming in March 2015 in connection with child custody proceedings. *Id.*

This Court denied Quinn's Post-trial Motions in an Order dated October 3, 2016. ORDER DENYING DEFENDANT'S POST-TRIAL MOTIONS FILED FOR RECORD ON OCTOBER 4, 2016. In this Order, the trial court advised Quinn that he had 30 days to file an appeal with the Superior Court of Pennsylvania. However, due to an oversight on the part of the Clerk of Courts, a copy of such order was never sent to Quinn. Instead, the order was sent to Lovette who had withdrawn on-record as Quinn's Counsel. As such, Quinn was unaware that the Court had denied his Post-trial Motions and did not file his appeal to the Superior Court within 30 days. On November 22, 2016, upon learning of this error, this Court directed the Clerk of Courts to send Quinn a copy of the Order denying his Post-trial Motions and reinstated his appeal rights for an additional 30 days.

Quinn then filed a timely Notice of Appeal and Concise Statement of Matters Complained of on Appeal (Concise Statement) pursuant to Pennsylvania Rule of Appellate Procedure §1925(b). Quinn's concise Statement raises seven allegations of error, most of which contain sub-issues:

1) Did the Court err by denying Defendant his Due Process Rights?

2) Was there sufficient evidence presented at trial to sustain the jury's verdict?

3) Whether the trial court erred by revoking Defendant's bail pending sentencing?

4)      Whether Defendant was prejudiced by the actions of Assistant District Attorney Langerholc who allegedly held a vendetta against Defendant?

5)      Did the Court err by failing to recuse itself?

6)      Was standby counsel ineffective?

7)      Whether the trial court's sentence was inappropriate?

For the reasons discussed herein there is no merit to any allegation of error and the appeal should be denied and the Court's order affirmed.

# DISCUSSION

I.      Did the Court err by denying Defendant his due process rights?

Quinn's first allegation of error is that the trial court denied him due process rights. At the outset, it is important to note that many of the issues raised by Quinn, *infra*, were never raised before the trial court. In this Opinion, where an issue was raised on appeal but was not raised or preserved at trial, the trial court will only set out the facts surrounding the issue and note that the issue was neither raised nor preserved.

In order for an appellate court to undertake an analysis and review of the merits, an appellant must have properly preserved the issue for appeal. Pa.R.A.P. 302(a); *Thomas Jefferson Univ. v. Wapner*, 2006 PA Super 156, 903 A.2d 565 (Pa. Super. Ct. 2006). An issue is properly preserved only if the appellant raised the objection before the trial court and the objection was timely and specific. *Com. v. Vernon*, 324 Pa.Super. 395, 471 A.2d 897 (1984), *Dennis v. Se. Pennsylvania Transp. Auth.*, 833 A.2d 348 (Pa.Cmwlth. 2003). Finally, any issue not properly raised before the trial court is deemed waived and cannot be raised for the first time on appeal. Pa.R.A.P. 302(a).

Quinn cites numerous instances in which his due process rights were violated:

1. Whether due process rights were violated when the police criminal complaint contained two different charges, "communication stalking" at §2709.1(A)(2) and "venue stalking" at §2709.1(B)(2)? CONCISE STATEMENT, pg. 1.

Specifically, Quinn asserts in Section I.A. of his Concise Statement that, "The Police Criminal Complaint provided to the Defendant lists two distinctively different lead charges, namely 2709.1(a)(2) and 2709.1(b)(2)." Quinn further states that, as a result of this alleged discrepancy, his ability to mount a defense was clearly prejudiced. CONCISE STATEMENT, pg. 2.

Although this issue was never raised at trial, the trial court will summarily address the issue here as Quinn's argument manifests a clear misreading of 18 Pa.C.S.A. § 2709.1 – Stalking. First, the Police Criminal Complaint and the Criminal Information, Amended 6/2/2016, clearly list Count 1 as Stalking at 18 Pa.C.S.A. § 2709.1(a)(2). However, Quinn may be making reference to the section entitled, "Acts of the accused associated with this offense," in the Police Criminal Complaint. There, 18 Pa.C.S.A. § 2709.1(b)(2) is mentioned.

Quinn's assertion that he was prejudiced by a mention of sections (a)(2) and (b)(2) has no merit as section (b)(2) does not list a separate charge or offense, but merely clarifies the offense listed in subsection (a). Subsection (a) is titled "Offense Defined" and states that a person can commit the crime of Stalking by committing the acts listed in either (a)(1) or (a)(2). Subsection (b) is titled "Venue," and (b)(2) merely clarifies that, "Acts indicating a course of conduct which occur in one jurisdiction may be used by any other jurisdiction in which an act occurred as evidence of a continuing pattern of conduct or a course of conduct." 18 Pa.C.S.A. § 2709.1(b)(2). Clearly, (b)(2) is not a separate offense or even an alternative classification of actions constitution the crime of Stalking. This subsection provides,

generally, that acts occurring in different jurisdictions can still be considered evidence of "course of conduct" in the other jurisdiction. Thus, although Quinn failed raise this issue at trial and, as discussed *supra*, waived it for appeal, his argument lacks merit as it is based on a misreading of the statute.

2. Whether due process rights were violated when Defendant was not notified of a Preliminary Conference and did not have the chance to attend a Preliminary Conference with the District Attorney's Office? CONCISE STATEMENT, pgs. 2-3.

Quinn next asserts that he was never notified of a Preliminary Conference and did not have the chance to attend the same. As stated *supra*, an issue not raised before the trial court is deemed waived and cannot be considered for the first time on appeal. Pa.R.A.P. 302(a).

Here, Quinn failed to raise the issue of lack of notice of a Preliminary Conference or his absence at such Preliminary Conference before the trial court. A review of the record, including transcripts of the jury trial and all hearings, as well as Quinn's Post-sentence motions, shows that Quinn failed to raise this issue prior to or during trial. Thus, the issue of whether Quinn was notified of or afforded a Preliminary Conference should be deemed waived and cannot be raised on appeal.

3. Whether due process rights were violated when Defendant was never given an opportunity to read the original text messages or hear the voicemails? CONCISE STATEMENT, pg. 3.

Quinn next asserts that, "The Commonwealth never provided the Defendant an opportunity to read the original text messages or hear the original voicemails despite the Defendant's request to do so, which violated 'Best Evidence' rules of procedure." A review of the record by the trial court indicates Quinn was provided said messages. Furthermore, Quinn never explicitly objected to these recordings, but rather he stated that he was concerned that they would not be played in their entirety. Pennsylvania Rule of Evidence 1002 –

Requirement of the Original, provides that, "An original writing, recording, or photograph is required in order to prove its content unless these rules, other rules prescribed by the Supreme Court, or a statute provides otherwise." The voicemails and testimony at trial satisfy the requirements of Pa.R.E. 1002.

Prior to bringing the jury into the courtroom on the first day of trial, the trial court spoke to Quinn and the Commonwealth to address any pre-trial motions or questions:

The Court: Are there any other questions procedurally about what is going to take place?

Attorney Langerhole: Just we had provided a copy of voicemails sent from this Defendant to the victim. We intend to play those for the jury, and I have Detective Hinterliter here to testify as to chain of custody. He took those voice mails from the phone to the CD, which has been provided to the Defendant, just procedurally that's all.

The Court: Are you able to authenticate the voice mails through the witnesses?

Attorney Langerhole: Yes.

The Court: Assuming there is authentication and the chain of custody is established, then that would be admissible.

The Defendant, Robert Quinn: The only issue that I have, I hadn't had an opportunity yet to review those. I tried to listen to the tapes, I had it on my laptop, and for some reason the DVD wouldn't load into my laptop. I am not sure whether they are timestamped and dated.

I personally don't actually recall making those specific voice mails in question, but I know that over the course of, as I said, six months of arguments and back and forth messages between us, I am not sure that those messages were made on that date, and I would just like, at this point, to establish that I intend to object of they are not timestamped or otherwise.

Attorney Langerhole: They are timestamped.

The Court: Again, whomever is introducing evidence, they have a burden of making sure that it's relevant and authenticated, and assuming that that's done, it's admitted, but we will rule on that as it comes in.

The Defendant, Robert Quinn: Also, Your Honor, I would ask that the Best Evidence Rule applies also with regard to those voice mails. I am not certain, I believe they are edited and they could, I believe they may be edited in a way to paint a picture that doesn't establish the complete picture.

If there is a three-minute voice mail and they cut 20 seconds out, I would ask the entire voicemail be played. I think it goes to a major part of my argument in this case, which is intent.

The DA needs to prove intent, what was my intent? If I did, in fact, send these messages, was it to harass Miss Labarko? Was it to cause her emotional distress or was it to ascertain facts?

The Court: Your objection then is best evidence, you believe it has been edited, what is your response to that, Attorney Langerhole?

Attorney Langerhole: They have not been edited. Detective Hinterliter can testify to that. If he wants her to play them directly off her telephone, we are fine doing that as well.

The Court: In terms of what is being played from, if there is testimony that the CD is the same information as the phone, the Court will permit either to be played.

With regard to the Best Evidence Rule, if you are playing them in their entirety, then that is the best evidence.

Attorney Langerhole: The voice mails that were downloaded or recorded to this audio, have not been edited and are the voice mails in their entirety, haven't been touched or doctored or cut off or anything with regard to that.

The Court: Your witness can testify to that, at this point, if that's established it will be admitted. If that's not established, you can make an objection and come to sidebar to argue that.

N.T. JURY TRIAL, 6/8/2016, pgs. 13-15. Quinn later objected to the admission of one voicemail, stating that "it's obviously been edited." *Id.* at 201.

It was later established that the voicemails sounded as if they had been cut off because there was a time limit on the length of voicemails accepted by Labarko's iphone. N.T. JURY TRIAL, 6/8/2016, pg. 83. Therefore, if Quinn continued to talk after the time expired, the recording would have been cut off at the expiration of time. Quinn again objected to the

playing of the voicemails that sounded like they had been cut off. *Id.* at 201-02. The trial court overruled his objection, stating that testimony from Labarko and Hinterliter showed that the voicemails had not been edited.

Quinn's assertions are meritless for two reasons. First, although Quinn states in his Concise Statement that he was never provided with the messages, the record clearly shows the contrary. Quinn clearly stated that the Commonwealth turned over the CD containing the messages, but Quinn was unable to get his computer to play the messages. No further objections were raised by Quinn as to failure by the Commonwealth to disclose messages.

Next, Quinn asserts error based the "Best Evidence Rule" – Pa. Rule of Evidence 1002. However, the record shows that while Quinn objected to the admission of the voicemails as they sounded edited, these messages were not edited by Labarko or Hinterliter. Rather, Quinn's messages exceeded the length allowed by Labarko's phone. His message stopped recording when the time limit was reached. Detective Hinterliter established that these voicemail recordings had been taken from Labarko's phone, were sent from Quinn's phone number, and contained the entire voicemail recorded. Based on the testimony of Labarko and Hinterliter, the trial court overruled Quinn's objection, stating that evidence showed no editing had occurred. *Id.* at 202. Therefore, the voicemails played satisfied Pa.R.E. 1002 since the recording contained the entirety of the voicemail messages on Labarko's phone. Thus, there is no merit to this allegation of error and the trial court's ruling should be affirmed.

4. Whether due process rights were violated when Defendant was not provided with a copy of the elements of the crime until the second day of trial?

Next, Quinn states that he was not provided a copy of the elements of the crime until the second day of trial and, "Even then, that document was substantially edited the following day, just moments before the Defense had to make closing arguments." CONCISE STATEMENT, pg. 3. To be clear, it is believed that Quinn is referring to a written copy of the elements of the offenses provided by the trial court to jury. The trial court and parties had discussed and agreed that the trial court would send a copy of the written elements with the jury to aid in their deliberation. On the morning of June 10, 2016, the trial court provided copies of the written elements to both Quinn and the Commonwealth for review so that either party could object to the format or contents of the elements. A review of the record shows that a copy of the written elements was never entered as evidence. However, the trial court obtained such elements from the Pennsylvania Standard Criminal Jury Instructions – Third Edition. Specifically, the trial court included Instruction # 15.2709.1 – Stalking and Instruction # 15.2706 Terroristic Threats. Neither party took issue with or objected to the contents or form of such written elements. In giving its charge to the jury, the trial court read from these written elements verbatim:

> Count 1, Stalking. The defendant has been charged with stalking. To find the defendant guilty of this offense, you must find that each of the following elements has been proven beyond a reasonable doubt:
>
> > First, that the defendant engaged in a course of conduct, that is, committed more than one act over a period of time, however short, that conveyed to Barbara Labarko that such conduct would continue; or repeatedly committed acts; or repeatedly communicated to Barbara Labarko. By communicate, I mean that the defendant conveyed a message without intent of legitimate communication or addressed by oral, nonverbal, written, or electronic means, including telephone, text message, email, internet, or similar transmission; and

Second, that the defendant did so under circumstances that demonstrated he intended to put Barbara Labarko in reasonable fear or bodily injury, or intended to cause her substantial emotional distress. Emotional distress means a temporary or permanent state of mental anguish. Bodily injury means any impairment of physical condition or substantial pain.

If you are satisfied that the two elements of stalking have been proven beyond a reasonable doubt, you should find the defendant guilty. Otherwise, you must find the defendant not guilty.

Count 2, Terroristic Threats. The defendant has been charged with the offense of terroristic threats. To find the defendant guilty of this offense, you must find that the following elements have bene proven beyond a reasonable doubt:

First, that the defendant communicated, either directly or indirectly, a threat. The term communicate means convey in person, or by written or electronic means, including telephone, text message, email, internet, or similar transmission.

Second, the defendant communicated the threat to commit any crime of violence with intent to terrorize another. If you are satisfied that the two elements of terroristic threats have been proven beyond a reasonable doubt, you should find the defendant guilty. Otherwise, you must find the defendant not guilty.

N.T. JURY TRIAL, 6/10/2016, pgs. 73-75.

As the record reflects, Quinn failed to object to the form or contents of the written elements and the oral recitation of such by the trial court. Furthermore, the trial court could find no statute or case law requiring the trial court to provide a defendant with the elements of the crimes charged where the defendant had already been provided the criminal information and complaint. Even so, and as stated in Section I, *supra*, Quinn has waived any objection in this matter and cannot raise this issue for the first time on appeal.

5. Whether due process rights were violated when the prosecution was afforded what amounted to an opening statement prior to jury selection when asked by the Court to give a summary of the alleged facts? CONCISE STATEMENT, pg. 4.

Quinn further alleges error and prejudice arising from Assistant District Attorney Langerhole's summary of the case given to the jury pool. During the *voir dire* process, the

trial court asked Langergholc, "to give a very brief summary of the alleged facts of this case. And again, these are just allegations." N.T. JURY SELECTION, 6/3/2016, pg. 46. Langerholc responded.

> Thank you, Your Honor. The defendant and victim were involved in a relationship. She ended the relationship. And on or about December of 2015 to January 14th of 2016, the defendant stalked the victim, sent thousands of text messages when the victim did not want them and sent over 200 voice mails threatening, demeaning, placing her in fear, then followed her to Planet Fitness, approached her, kissed her on the cheek, was taken into custody shortly thereafter. Charges were filed as a result.

*Id.* at 46-47. The trial court then asked the jury pool, "Have any of you heard or read anything concerning this alleged incident? If so, please rise. Let the record reflect no jurors rose in response to this question." *Id.*

Quinn also raised a related issue, asserting that these statements by Langerholc caused one juror to state that he could not be fair and impartial in this case. CONCISE STATEMENT, pg. 4; N.T. JURY SELECTION, 6/2/2016, pgs. 57-58. Specifically, Panelist #19 stated that his daughter had previously been molested. The trial court then questioned Panelist #19:

> The Court: Now, obviously that's a very different thing from what we're dealing with today. Is there anything about that experience which would not allow you to sit and be fair and impartial in this case?
>
> Panelist #19: The fear in that girl's eyes over there.
>
> The Court: Pardon me?
>
> Panelist #19: I seen the fear in that little girl's eyes sitting over there.
>
> The Court: And what are you telling me then? Do you think you can be fair and impartial in this case?
>
> Panelist #19: I don't know honestly.
>
> The Court: I'm going to go a little further, which is okay. I asked several others the same question. What I'm asking you is - - Mr. Quinn is the one facing charges. They are allegations at this point. So I'm asking, would you be able to sit, listen to the

witness on the stand and gain the facts from the witnesses, and then I will give you the law that you are to apply, and you and your fellow jurors would go back to deliberate. Are you able to do that fairly and impartially?

Panelist #19: Yes.

The Court: Okay. Any follow up questions based upon that?

Attorney Langerhole: No. Thank you, sir.

The Defendant: What number was that?

Attorney Langerhole: Nineteen.

N.T. JURY SELECTION, 6/2/2016, pg. 58.

Quinn later moved to strike Panelist #19 for cause, but the trial court denied such stating,

I recognize your motion to strike. I am going to deny it based upon the fact that the court's notes also indicate that, although he made that statement early, as the court questioned him about the facts of the case, the fact that you were a separate issue than his daughter who was molested, that was the original discussion, he indicated after discussion about his role as a juror that he believed he can be fair and impartial.

So your strike for cause is denied. And just – Mr. Quinn, obviously you will have five challenges, so you'll have that.

*Id.* at 80. As Quinn correctly notes in his Concise Statement, although Panelist #19 was not stricken for cause at that time, Panelist #19 was not ultimately selected as either a juror or alternate.

A review of the record indicates that Quinn did not object to Langerhole's summary of the facts at that time or at any time until raising the issue here on appeal. As such, and as stated in Section I, *supra*, Quinn has waived this issue and cannot raise it for the first time on appeal.

6. Whether due process rights were violated when the victim, Labarko, was allowed to sit behind the prosecutor during jury selection?

Next, Quinn asserts error and prejudice based on the presence of the victim, Labarko, at jury selection. Again, and as stated in Section 1, *supra*, Quinn failed to object to or otherwise raise this issue during trial. Thus, Quinn has waived this issue and cannot raise it for the first time on appeal.

7. Whether due process rights were violated when the trial court refused to remove jurors for cause who initially claimed bias but later stated they could be fair and impartial at Quinn's trial?

The next issue raised by Quinn is whether the trial court erred by, "regularly refusing to remove jurors who initially claimed bias." It is initially noted that Quinn made no objections based on the trial court's failure to remove jurors for cause. He neither specifically objected, expressed disagreement with the trial court's decisions as to striking jurors for cause, nor raised any such issue in his Post-sentence motions.

However, even if an objection had been made, law does not require removal for cause of every juror who "initially claim[s] bias." Under Pennsylvania law, "jurors are not required to be free from bias, but only to seek to put aside those prejudices in the performance of their duty, the determination of guilt or innocence." *Pursell v. Horn*, 187 F.Supp.2d 260, 307 (W.D. Pa. 2002). The Pennsylvania Supreme Court has held that, "it would be unrealistic to expect jurors to be free from all prejudices, a failing common to all human beings." *Com. v. Johnson*, 452 Pa. 130, 305 A.2d 5, 8 (1973). Instead, jurors are required to "to put aside those prejudices in the performance of their duty, the determination of guilt or innocence." *Id.* As the Pennsylvania Supreme Court has consistently reiterated, "We therefore do not expect a tabula rasa but merely a mind sufficiently conscious of its sworn responsibility and willing to

attempt to reach a decision solely on the facts presented, assiduously avoiding the influence of irrelevant factors." *Id.*

Therefore, even if Quinn had preserved this issue for appeal, his contention that error exists based on the failure to strike jurors for cause who only, "initially claimed bias" would be in clear contention with the laws of Pennsylvania. However, because Quinn neither objected to the trial court's decisions regarding striking jurors for cause nor raised said issue in his Post-sentence motions, this issue has been waived and cannot be raised for the first time on appeal.

8. Whether due process rights were violated when the trial court allowed the admission of the following statements:

    a. Statement by Labarko that Quinn did not have custody of his children when they met but rather supervised visits.

First, Quinn challenges the admission of Labarko's statement that Quinn was only allowed supervised visitation with his children when he and Labarko first met. CONCISE STATEMENT, pg. 5; N.T. JURY TRIAL, 6/8/2016, pg. 59. Quinn first objected that this statement was hearsay. Hearsay is defined as a "statement that the declarant does not make while testifying at the current trial or hearing; and a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801. Hearsay is not admissible except as provided by certain delineated exceptions set out by the Pennsylvania Rules of Evidence. Pa.R.E. 802.

Here, Langerholc responded to Quinn's hearsay objection by stating that Labarko's statement was not hearsay as she was testifying that she personally observed that Quinn only had supervised visitation with his kids. The trial court overruled Quinn's hearsay objection as

Labarko was not testifying as to an out of court statement, but rather something she observed first hand. N.T. JURY TRIAL, 6/8/2016; pg. 59-60.

Quinn then objected to the same statement based on lack of foundation. The trial court considered Quinn's second objection and allowed Langerhole to explore whether Labarko had direct knowledge or had observed that Quinn only had supervised visitation with his kids. Langerhole questioned Labarko and Labarko answered, "I personally watched [Quinn] in the ACRP downtown Johnstown. He had one hour. He took a bag of toys and games and told me that he had supervised visitation." *Id.* at 61. Thus, because the trial court properly overruled Quinn's hearsay objection and allowed the statement after Langerhole laid a foundation, there is no merit to this allegation of error and the trial court's ruling should be affirmed.

   b. Statements at trial which Quinn failed to object to.

Quinn lists four other statements made at trial that he alleges were improperly admitted:

   (1) Statement by that Quinn assaulted Labarko in the past.

   (2) Statement by Labarko that Quinn had stalked her at Planet Fitness.

   (3) Statements by prosecution that Quinn threw a table while meeting with Labarko at the hospital in January.

   (4) Statement by Labarko that Quinn had been hospitalized.

CONCISE STATEMENT, pgs. 5-6. The record indicates that, while such statements were made, Quinn did not object to any of the four statements listed above. As stated in Section 1, *supra*, an issue not raised before the trial court is deemed waived and cannot be considered for the first time on appeal. Pa.R.A.P. 302(a). Thus, because Quinn failed to make timely objections

to these statements, the issues were not preserved and cannot be raised for the first time on appeal.

9. Whether the trial court erred by precluding Quinn from introducing evidence that Labarko requested payment of $5,000 to "drop the charges" and had previously received a payment of $9,000 from another person to drop a separate criminal charge.

Quinn next alleges that the trial court erred by precluding testimony regarding Labarko's request of $5,000 from Quinn to drop the charges and a separate instance where Labarko received $9,000 from another person to drop a separate criminal case. However, the record clearly shows that the trial court never precluded such testimony and, even if it had, Quinn never raised an objection to the alleged preclusion of such.

Quinn first refers to an alleged offer by Labarko to pay Quinn to "drop the charges" in his opening statement:

> And finally, ladies and gentlemen, the evidence is going to show that [Labarko] attempted to get $5,000 out of me to drop the charges. I don't know that that was her primary motivation, I wouldn't go through all of this for $5,000, but that's another aspect of this case that the evidence is going to show.

N.T. JURY TRIAL, 6/8/2016, pg. 57. No objections were made to Quinn's mention of the alleged offer of $5,000 in his opening statement and the trial court took no action to preclude or strike Quin's statement.

The next mention of the offer to pay $5,000 occurs between the cross-examination of Barbara Labarko and the direct examination of Brett Labarko. During cross examination, Quinn asked Barbara Labarko, "Do you recall contacting me by phone February 9th or February 10th?" *Id.* at 186. Barbara Labarko begins to answer, "My PFA --." *Id.* at 187. Langerhole then objected,

Attorney Langerhole: Objection, is that February of January?

The Defendant, Robert Quinn: February.

The Court: Let's approach.

*Id.* In his pre-trial motions, Quinn had requested that evidence of a previous PFA against him and protecting Barbara Labarko be excluded and the Court granted such motion, but cautioned Quinn that if he opened the door to introduction of such evidence, then evidence of the PFA would be admissible. *Id.* at 8-10.

After the parties approached at sidebar, the trial court advised Quinn that he had "opened the door" by asking about the contact with Labarko during a time which she had a PFA against Quinn. The trial concluded by telling Quinn that he could continue his cross-examination of Labarko, but if he opened the door to introduction of the PFA then the trial court would allow such evidence. *Id.* at 187. Quinn decided to end his cross-examination of Labarko.

Still at sidebar, Langerholc advised the trial court and Quinn that the Commonwealth's next witness would be Brett Labarko, Barbara Labarko's brother. The following conversation ensued:

> Quinn: Your Honor, perhaps with regards to Brett's testimony, I would like to question him as to basically he told me at one point if I paid his sister she would drop the charges.

> The Court: Who told you that?

> Quinn: Brent (sic) in a phone call.

> The Court: I thought this was Brett?

> Langerholc: He called him Brent, it's her brother.

> Quinn: What I am concerned about, I can raise the issue as part of my - -

> The Court: You are indicating he called you and offered to give you money.

Quinn: He offered me, he approached me in person at the Geistown Country Club.

The Court: What are you going to ask him, did he say this?

Quinn: Well, the one thing, I wanted to clarify, I asked him, I am sure he will deny it, because that's after the timeframe of the PFA to make sure that is not opening the door for that.

The Court: You can ask if there was money offered and you live with the answer.

Langerhole: Can I just have a minute to tell [Brett], just to reiterate to him that he's not to testify as to the PFA because I have not talked to him.

*Id.* at 188-89. At this point in the trial, Quinn was concerned that he may open the door to testimony regarding a PFA against him by asking Brett Labarko about an alleged offer to drop the charges in exchange for a $5,000 payment. The trial court instructed Quinn that he was permitted to ask Brett Labarko about the $5,000, but that if this line of questioning led to testimony about the PFA, Quinn would have opened the door and testimony about the PFA would be admissible. Quinn continued with direct examination of Brett Labarko and asked, "Do you recall telling me in April that if I gave your sister $5,000, she would drop the charges?" *Id.* at 196. Brett Labarko answered, "I don't recall that." *Id.* Quinn then ended his direct examination.

Additionally, Quinn asserts error with regard to preclusion of evidence that Barbara Labarko received a payment of $9,000 in the past from Jackie Long in exchange for dropping criminal charges. The record indicates that Quinn never attempted to offer evidence of such a payment. Quinn briefly mentions Jackie Long during his direct examination by stating that Long and Labarko got into a fight at a country club which led to Labarko contacting the police and filing assault charges against Long. N.T. JURY TRIAL, 6/9/2016, pg. 91. Langerhole objected as to the relevance of Quinn's testimony regarding the fight and ensuing criminal

charges against Long. The trial court sustained Langerole's objection as to relevance. Quinn never again mentioned the charges against Jackie Long and never testified or attempted to testify that Jackie Long had paid Labarko $9,000.

Although Quinn asserts in his Concise Statement that the trial court erred by not allowing him to offer evidence of payment of $9,000 and an offer to pay $5,000 in exchange for dropping charges, the record reveals that such an allegation is clearly false. In fact, Quinn referred to the $5,000 payment in his Opening Statement and questioned Brett Labarko about the offer. The trial court never made a ruling that precluded Quinn from offering evidence of either offer and, as such, Quinn could not object to such at trial. Thus, because the trial court never ruled that Quinn could not present evidence of a payment of $9,000 or an offer to pay Labarko $5,000 and, consequently, Quinn could have never objected, this allegation of error is meritless as it mischaracterizes the record and does not present an action by the trial court that can be reviewed on appeal.

II.    Was there sufficient evidence presented at trial to sustain the jury's verdict?

Quinn's second main issue raised on appeal is whether the verdict was against the weight of the evidence presented at trial. Pa.R.Crim.P. 607 provides that, "A claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial: (1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion."

The Pennsylvania Supreme Court has held that,

It is well settled that a defendant must present his challenge to the weight of the evidence to the trial court for a review in the first instance. *See* Pa.R.Crim.P. 607(A); *Com. v. Griffin*, 2013 PA Super 70, 65 A.3d 932, 939 (Pa. Super. Ct. 2013). Thereafter, appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the

evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Com. v. Widmer*, 560 Pa. 308, 744 A.2d 745, 753 (2000) (citations omitted). Furthermore, inclusion of a challenge to the sufficiency of the evidence in an appellant's Rule 1925(b) Statement is insufficient to preserve the issue for appeal where it was not previously raised before the trial court. *Griffin*, 65 A.3d at 938.

Here, Quinn raises his weight of the evidence claim for the first time in his Rule 1925(b) statement. He failed to raise such either orally or by written motion before sentencing and did not include this issue in his Post-sentence motion. Thus, because Quinn raises his challenge to the weight of the evidence for the first time in his Rule 1925(b) statement, he has waived this issue for purposes of appeal.

III. **Whether the Court erred by revoking Defendant's bail pending sentencing?**

Quinn's next issue raised on appeal is whether the trial court erred by revoking his bail following the jury verdict and prior to sentencing. CONCISE STATEMENT, pgs. 4-5. However, an order revoking bail is an interlocutory order, which is non-appealable. *Com. v. Colleran*, 323 Pa.Super. 1, 469 A.2d 1130, 1131 (1983). The Courts have held that, "The proper method to challenge an order of a trial court refusing or revoking bail is by means of a petition for review pursuant [to the Rules of Appellate Procedure]." *Id.*; *See also* Pa.R.A.P. 312. Thus, because Quinn utilized improper procedure by raising this issue on direct appeal rather than by means of a petition for review, the appeal as to the issue of bail revocation should be quashed.

IV. Whether Defendant was prejudiced by the actions of Assistant District Attorney's Langerhole who allegedly held a vendetta against Defendant?

The fourth issue presented on appeal is whether Quinn was prejudiced by the actions of Langerhole who, allegedly, had a vendetta against Quinn. Quinn asserts that Langerhole had a vendetta against Quinn based upon Quinn and Langerhole's relationships with a third party. These facts were never introduced by Quinn at trial and no such allegation was ever raised before the trial court. Quinn also states that such a vendetta was manifested by statements made by Langerhole at trial, such as referring to Quinn as, "God's gift." CONCISE STATEMENT, pg. 8. However, Quinn never objected to such statements by Langerhole.

As stated in Section I, *supra*, an issue not raised before the trial court is deemed waived and cannot be considered for the first time on appeal. Pa.R.A.P. 302(a). Thus, because Quinn neither raised the issue of Langerhole's alleged personal vendetta nor objected to Langerhole's statements which evidenced such prejudice, these issues were not preserved and cannot be raised for the first time on appeal.

V. Did the Court err by failing to recuse itself?

Quin's next allegation of error is that the Court failed to recuse itself based on this jurist's prior role as an assistant district attorney during which time this jurist was involved with an indirect criminal contempt proceeding involving a Protection from Abuse (PFA) order between Quinn and his ex-wife. Quinn alleges that this jurist was involved in such proceedings in approximately 2009. Furthermore, Quinn asserts that his ex-wife posted on her Facebook page during this jurist's campaign that this jurist had been helpful in the PFA process.

Initially, the trial court observes that no Motion to Recuse was made at any time before or during the trial. In fact, prior to jury selection, the trial court stated to Quinn:

I want to begin, Mr. Quinn, I didn't remember the case, but it was brought to my attention apparently in 2013 or 2014 when I was an assistant district attorney there was a PFA indirect criminal contempt, and I was the assistant DA on the case. I believe that the case was dismissed.

I don't have any independent recollection of the case and, because this is a jury trial, and in reviewing the rules, I have no opinion. I have no recollection of it; and I determined, since this is a jury trial, the fact finders are the jurors and not this court, that I do not believe there is any conflict. I did want to disclose that to you, however, just for complete transparency.

N.T. JURY SELECTION, 6/2/2016, pgs. 3-4. After this disclosure by the trial court, Quinn made no Motion to Recuse at that time and a review of the complete transcripts of the proceedings in this case reveal that no such motion was ever made before or during trial.

However, after the jury rendered its verdict, Quinn did raise the issue of recusal in his post-sentence motions. The trial court began the hearing on Quinn's post-sentence motions by stating:

I understand [recusal is] one of your issues that you can argue, but because the Court has made its decision on this, previously on the record the Court colloquied you prior to the beginning of the proceedings, before the trial, before jury selection regarding my involvement, and you waived that conflict. It does not mean that you can't address that again, but for the purposes of going forward for today's hearing I am going to remain on the case.

N.T. POST-SENTENCE MOTIONS, 9/27/2016, pg. 8. Quinn responded,

Your Honor, if I might just for the record, I would disagree with your characterization that I waived my right to object to your hearing the case. As I recall, it was prior to jury selection, and as the Call of the List was before Judge Kiniry. He issued jury selection. I came to the Court that day expecting to see Judge Kiniry. When you came to the stand, I believe the very first issue you raised, and no one had raised or I had said anything to my knowledge, perhaps the Prosecution has, but you basically made a ruling on it, which to me there was, as novice *pro se*, there was no reason for me to object because you had already ruled and basically you came to the court. You raised the issue that you had prosecuted me previously on a PFA, alleged PFA violation and

that because you were not the finder of fact you felt no reason to recuse yourself from the matter. At that point, again my understanding as a novice, was there was no reason to object because you had just ruled on the issue. I never intentionally waived that as an objectionable issue.

*Id.* at 8-9.

It is well-settled that, "a party seeking recusal or disqualification must raise the objection at the earliest possible moment, or that party will suffer the consequences of being time barred." *Com. v. Stafford*, 2000 PA Super 76, 749 A.2d 489, 501 (Pa. Super. Ct. 2000). Furthermore, where a defendant chooses to proceed *pro se*, the defendant still must adhere to the rules of Criminal Procedure and Evidence. It is no excuse that a *pro se* defendant was not aware of the proper procedure to raise objections and preserve issues for appeal.

Additionally, the Pennsylvania Supreme Court has explained the issue of recusal:

The standards for recusal are well established. It is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially. As a general rule, a motion for recusal is initially directed to and decided by the jurist whose impartiality is being challenged. In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner, free of personal bias or interest in the outcome. The jurist must then consider whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision that only the jurist can make. Where a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overruled on appeal but for an abuse of discretion. In reviewing a denial of a disqualification motion, we recognize that our judges are honorable, fair and competent.

*Com. v. Abu-Jamal*, 553 Pa. 485, 720 A.2d 79, 89 (1998) (citations omitted). *See also, Com. v. O'Shea*, 523 Pa. 384, 567 A.2d 1023, 1034 (1989); *Com. v. Bonds*, 2005 PA Super 432, 890 A.2d 414 (Pa. Super. Ct. 2005). The rule is simply that "disqualification of a judge is mandated whenever 'a significant minority of the lay community could reasonably question

the court's impartiality." *Com. v. Bryant*, 328 Pa.Super. 1, 476 A.2d 422, 425 (1984) (citations omitted).

As noted above, this matter was not raised by way of a motion until Quinn's Post-Sentence Motions. The trial court raised the issue and, in the interest of transparency, stated that this jurist believed she could be fair and impartial in this matter. At that time, Quinn could have easily objected and made a Motion for Recusal. Instead, Quinn said nothing and proceeded to jury selection. Quinn's lack of knowledge of the rules of procedure are no excuse for his failure to make a Motion for Recusal until after a jury verdict had been rendered. Thus, because Quinn failed to object to this jurist's presiding over the case or make a Motion for Recusal until his Post-Sentence Motions, this issue is time barred and waived for appeal.

VI.    Was standby counsel ineffective?

Quinn's next issue raised on appeal is whether his standby counsel was ineffective? CONCISE STATEMENT, pg. 11. He raises this issue in both Sections. V. and VII. of his Concise Statement. However, the trial court declines to address Quinn's claim of ineffective counsel in this Opinion.

In *Com. v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), *clarified on denial of reargument*, 573 Pa. 141, 821 A.2d 1246 (2003), *holding modified by Com. v. Bethea*, 574 Pa. 100, 828 A.2d 1066 (2003), the Pennsylvania Supreme Court announced a new general rule concerning the time and manner for raising claims of ineffective assistance of counsel. The Court held that "a defendant 'should wait to raise claims of ineffective assistance of trial counsel until collateral review.'" *Com. v. Bomar*, 573 Pa. 426, 826 A.2d 831, 853 (2003) (quoting *Grant*, 826 A.2d at 738). Raising a claim of ineffective assistance of counsel at collateral review

rather than on direct appeal gives the petitioner the "time necessary . . . to discover and fully develop claims related to trial counsel ineffectiveness." *Grant*, 572 Pa. 48. The Court determined that, since "appellate courts do not normally consider issues that were not raised and developed in the court below." *Id.*, "deferring review of trial counsel ineffectiveness claims until the collateral review stage of the proceedings offers a petitioner the best avenue to effect his Sixth Amendment right to counsel." *Com. v. Watson*, 2003 PA Super 410, 835 A.2d 786, 792 (Pa. Super. Ct. 2003) (quoting *Grant*, 572 Pa. at 738). More recently, the Pennsylvania Supreme Court has reaffirmed that holding in *Grant*, 572 Pa. 48, stating, "we reaffirm *Grant* and hold that, absent [certain exceptions], claims of ineffective assistance of counsel are to be deferred to PCRA review; trial courts should not entertain claims of ineffectiveness upon post-verdict motions; and such claims should not be reviewed upon direct appeal." *Com. v. Holmes*, 621 Pa. 595, 79 A.3d 562, 576 (2013).

Although some case law indicated that the courts had created an exception to this general rule such that a defendant could raise an ineffective assistance of counsel claim on direct appeal, the Pennsylvania Supreme Court in *Com. v. O'Berg*, 584 Pa. 11, 880 A.2d 597, 602 (2005), overruled any cases recognizing such an exception. The Court held that,

> As a general rule, claims of ineffective assistance of counsel will not be entertained on direct appeal. Moreover, we take this opportunity to disapprove of any decisions of the Superior Court that are to the contrary. For these reasons, we do not believe there is a need to create a "short sentence" exception to the general rule announced in *Grant*, 572 Pa. 48. Indeed, we fear doing so would undermine the very reasons that led to our decision in *Grant*, 572 Pa. 48 in the first instance.

Similarly, in *Com. v. Simmons*, 2004 PA Super 71, 846 A.2d 142, 144 (Pa. Super. Ct. 2004), the Court considered whether a defendant could raise the issue of ineffective assistance of counsel on direct appeal when the defendant was sentenced to a term of incarceration of

eleven and one-half months to twenty-three months followed by a term of probation. Based on that length of sentence, the Court held that, "Appellant will have ample opportunity to challenge his counsel's effectiveness in a collateral attack. Accordingly, we find that the *Salisbury* exception does not apply to the Appellant's ineffective assistance of counsel claim and the claim must be dismissed pursuant to *Grant*. *Id.*

Here, Quinn was sentenced to a term of imprisonment for "not less than one year less a day, nor more than 2 years less a day." The minimum of Quinn's sentence is approximately one-half of a month longer than the sentence of the defendant in *Simmons*, 2004 PA Super 71. Thus, because Quinn's sentence provides ample time to raise ineffectiveness of counsel on collateral review, and since the record is void of any determination of the trial court as to the matter, the trial court declines to address the issue of ineffectiveness of counsel in this Opinion.

VII.    Whether the Court's sentence was inappropriate?

Quinn's final issue allegation of error is that,

The sentence of the court was inappropriate and the judge allowed the prosecution to assert that a non-violent crime such as this is worse than violence, which ignores laws which provide aggravating circumstance when violence is involved. The sentencing range was 3-14 months but the court sentenced the Appellate[sic] to 12 months minus a day to 24 months minus a day.

CONCISE STATEMENT, PG. 13.

204 PA.CODE § 303.1 requires that, "The court shall consider the sentencing guidelines in determining the appropriate sentence for offenders convicted of, or pleading guilty or nolo contendere to, felonies and misdemeanors." To determine the guideline sentence applicable in a given case the law provides:

The procedure for determining the guideline sentence shall be as follows:

(1) Determine the Offense Gravity Score as described in § 303.3 and § 303.15.
(2) Determine the Prior Record Score as described in § 303.4--§ 303.8.
(3) Determine the guideline sentence recommendation as described in § 303.9--§ 303.14, including Deadly Weapon Enhancement, Youth/School Enhancement, Criminal Gang Enhancement, and Third Degree Murder of a Victim Younger than Age 13 Enhancement (§ 303.10), and aggravating or mitigating circumstances (§ 303.13).

204 Pa.Code § 303.2. For example, a guideline sentence may be 30-42 months. According to statute, "All numbers in sentence recommendations suggest months of minimum confinement pursuant to 42 Pa.C.S.A. § 9755(b) (partial confinement) and § 9756(b) (total confinement)." 204 Pa.Code § 303.9(e). Therefore, in the case of a guideline sentence of 30-42 months, the guidelines would recommend a minimum sentence between 30 and 42 months. Importantly, the minimum sentence cannot exceed half of the maximum sentence length. 42 Pa.C.S.A. § 9756(b)(1).

Initially, the trial court agrees that Quinn's guideline range for sentencing was 3-14 months. The trial court imposed a sentence of imprisonment for one year less a day to two years less a day. This sentence clearly falls within the guideline range of 3-14 months as the minimum sentence imposed was 12 months less a day. In fact, a sentence of 14-28 months still would have fallen within the guideline range. The issue raised by Quinn manifests a clear misunderstanding of the use and application of the guideline sentence range in Pennsylvania. It seems that Quinn believes that the complete sentence, including minimum and maximum, must fall within the guideline range. However, this is not in accordance with the applicable statutory law discussed *supra*. Thus, because the minimum term of imprisonment imposed by the trial court falls squarely within Quinn's guideline range, the trial court did not err by applying an aggravated range and sentencing Quinn outside of his guideline range.

Accordingly, as there is no merit to this or any allegation of error the appeal must be dismissed and Quinn's conviction and sentence affirmed.

Respectfully submitted,

Tamara R. Bernstein, Judge

March 24, 2017

COPIES TO:
PS ☑ DEF. ☐ C & F
PS ☑ DA ☐ SHERIFF
☐ ATTY. ☐ OTHER
☐ PO _____
☐ PD _____
☐ JAIL _____
☐ JUDGE _____
☐ CA _____